Borough Operating Corporation v. Commissioner.
Borough Operating Corp. v. Commissioner
Docket No. 52189.
United States Tax Court
T.C. Memo 1956-192; 1956 Tax Ct. Memo LEXIS 97; 15 T.C.M. (CCH) 1007; T.C.M. (RIA) 56192; August 27, 1956
J. H. Landman, Esq., 50 Broad Street, New York, N. Y., Richard G. Maloney, Esq., and Clarence Brazill, Esq., for the respondent. MULRONEY Memorandum Findings *98 of Fact and Opinion The respondent determined a deficiency of $15,929.09 in the income tax of the petitioner for the year 1952. The sole issue is the amount of gain realized by the petitioner in 1952 on the sale of an installment obligation received in 1934 upon the sale of real property, which computation turns upon the value of an agreement to purchase certain property, certain plans and specifications for a theatre building, and a Keith franchise received in 1913 by the petitioner in exchange for 750 shares of its original issue common stock. Findings of Fact Some of the facts have been stipulated and they are found accordingly. The Borough Operating Corporation, hereinafter called the petitioner, was incorporated on August 13, 1913, under the laws of the State of New York for the purpose of building and operating the Flatbush Theatre near Church and Flatbush Avenues, Brooklyn, New York, and maintains its office in New York, New York. Petitioner filed its Federal income tax return for the year 1952 with the district director of internal revenue, Upper Manhattan District, New York. Petitioner kept its books and filed its Federal tax returns on a calendar year basis and used *99 the cash basis method in reporting income. Petitioner, upon its incorporation in 1913, was authorized to issue 750 shares of voting, non-assessable common stock, par value $100 per share, and 750 shares of preferred stock, par value $100 per share. The incorporators and first directors and officers of the petitioner were Isidor Buxbaum, president, L. E. Eason, and Edwin C. Morsch, secretary and treasurer. On September 5, 1913, these were replaced by the following directors and officers: Anton Newburger, president, Henry Schoenherr, secretary and treasurer, and Louis Gress. On September 2, 1913, the petitioner purchased three assets under the authority of the following corporate resolution: "Upon motion duly made and seconded, and by the affirmative vote of all present, the following preamble and resolution was adopted: "WHEREAS, Anton Newburger and Robert T. Rasmussen have offered to sell and transfer to this company a certain agreement, dated July 28th, 1910, for the purchase from William P. Oetjen, of a parcel of land on the northerly side of Church Avenue near Flatbush Avenue, Brooklyn, N. Y., having a frontage on Church Avenue of 165 feet; and an agreement or franchise *100 from the United Booking Offices of America, dated June 6th, 1913, issued to Ben Kahn and assigned to Robert Rasmussen by assignment bearing date the 6th day of June, 1913, and the plans and specifications for the Flatbush Theatre, which is to be constructed upon the lands hereinbefore mentioned, in consideration of the issue of common stock of this company to the amount of $75,000 of the par value of $100 each. "WHEREAS, it appears to the stockholders that such property is necessary for the business of this company, and that the same is of the full value of $75,000. "RESOLVED, that the Board of Directors of this company be and they are hereby authorized, in their discretion, to purchase the property above mentioned for the said price and to issue said stock in payment thereof." The board of directors of the petitioner, pursuant to the above resolution, passed the following resolution: "RESOLVED, that this company accept the offer of Anton Newburger and Robert T. Rasmussen, to sell to this company, the property described in the draft agreement presented at this meeting, and the Board of Directors do hereby adjudge and declare that said property is of the fair market value of *101 $75,000., and that the same is necessary for the business of this company. "FURTHER RESOLVED, that the draft agreement for the sale of said property presented at this meeting be, and the same hereby is approved, and the President and Secretary of the Company, are hereby authorized and directed to execute said agreement in the name and on behalf of the company, and to affix the corporate seal thereto, and that the President and Secretary be, and they hereby are authorized and directed to issue certificates of common stock of this company, as provided in said agreement." An agreement was then reached between Anton Newburger and Robert T. Rasmussen as vendors and the petitioner as vendee containing the following preamble and agreement: "WHEREAS, the Board of Directors of the company have ascertained, adjudged and declared that the said property and rights are of the fair value of $75,000.00, and that the acquisition thereof is necessary for the business of the company and to carry out its contemplated objects: "NOW THEREFORE this agreement witnesseth: "I. That the vendors have sold, assigned, transferred and set over, and do hereby sell, assign, transfer and set over unto the *102 company, its successors and assigns, all right, title and interest in and to the following described property, to wit: "An agreement made on the 28th day of July, 1910, between William P. Oetjen, vendor, and Anton Newburger, vendee, for the acquisition of the property on Church Avenue near Flatbush Avenue, therein described, and the booking agreement between the United Booking Offices of America, dated June 6th, 1913, issue to Ben Kahn, and assigned to Robert T. Rasmussen by the said Ben Kahn, by assignment dated the same day, and the plans and specifications for the Flatbush Theatre prepared by Robert T. Rasmussen. "II. The company hereby agrees, in consideration of said sale, and upon the delivery of said property to it, to issue to the vendors and their nominees, as hereinafter provided, and to such other nominees as the vendors shall, in writing, hereafter direct, at such times and in such amounts as they shall respectively direct, certificates of common stock of the company to the aggregate amount of seven hundred and fifty shares, and said shares shall be deemed to be and are hereby declared to be full paid shares and not liable to any further call, and the holders of such *103 stock shall not be liable to any further payment thereon. "III. Said stock shall be issued as follows: "To the vendors Anton Newburger and Robert T. Rasmussen seven hundred and fifty shares. "IV. The delivery of the certificates for said shares to the above named parties and their respective receipts for the same shall be a full discharge of each fo the parties hereto to the extent thereof." Robert T. Rasmussen, who, with Anton Newburger, was a promoter of the new theatre building, was a theatrical architect and he persuaded the City of New York to issue a permit for the construction of the Flatbush Theatre in accordance with his plans and specifications which provided for a tunnel under the stage and a steel curtain outside the asbestos curtain on the stage. These plans and specifications, which were accepted by the City of New York, permitted the construction of a theatre of increased capacity. Rasmussen was later paid $60 per week by the petitioner for supervision. The theatrical booking franchise, hereinafter called the Keith franchise, which was acquired by the petitioner from Newburger and Rasmussen, was from the United Booking Company, a Keith theatrical enterprise *104 that booked vaudeville acts over the theatrical season of forty weeks and then made them available to those theatres that had a franchise. Only with this franchise could the petitioner obtain "big-time vaudeville" in its new theatre. Henry Schoenherr, the attorney who was active in the incorporation of the petitioner in 1913, emphasized the fact that the petitioner had a franchise for Keith acts in his conversations with the promoters and potential investors in the preferred stock of the petitioner. Anton Newburger, upon receipt of the 750 shares of petitioner's common stock, sold some of the shares to Robert T. Rasmussen. On November 14, 1913, Rasmussen granted Newburger an option to buy an unknown number of his shares of common stock in the petitioner, and on April 14, 1914, Newburger assigned this option to Louis Gress, Henry Schoenherr, Louis Ebling, William Ebling and to himself. On April 24, 1914, the following were among the stockholders of the petitioner: Shares
Louis Gress
25
Henry Schoenherr
84
Anton Newburger
175
Louis Ebling
50
William Ebling
50
The 750 shares of common stock issued by the petitioner in 1913 remained outstanding up to dissolution *105 of the petitioner in 1952. Petitioner issued for cash, at par, 625 shares of preferred stock to finance in part the construction of the Flatbush Theatre. As an inducement to purchase the preferred stock, a bonus of common stock was given by Newburger and Rasmussen to some of the purchasers of preferred stock. Among those receiving such common stock bonuses were Henry Schoenherr (65 shares of common) and his brother (64 shares of common). Henry Schoenherr owned 65 shares of petitioner's common stock on December 31, 1952, and his brother owned 64 shares of common stock as of the same date. By 1940 the petitioner had redeemed all of the outstanding preferred stock. The construction of the theatre was financed by advances made by Newburger, Henry Schoenherr, and others, by the sale of petitioner's preferred stock in the amount of $62,500, and by a mortgage in the amount of $79,000. In September 1914, the petitioner opened the Flatbush Theatre and operated it as a vaudeville house with a Keith Circuit of actors under the Keith franchise. In June 1916, the petitioner leased the theatre to other persons and continued to do so until 1934. On August 22, 1934, the Flatbush Theatre, including *106 the land and the building but not the Keith franchise, was sold by the petitioner to the William Brandt theatrical interests known as the Peter Pan Holding Co., Inc., for $265,000, with $35,000 of this in cash and the balance, $230,000, in the form of a purchase money mortgage. The profit computed in 1934 on the sale of the petitioner's assets, without including in the computation any basis for the Keith franchise, the contract to purchase the land, and the plans and specifications for the theatre building, was as follows: Sale price
$265,000.00
Cost: Land
$30,055.39
Building
$124,998.90
Less depreciation
76,620.68
48,378.22
Machinery and equipment
39,587.91
Less depreciation
39,587.91
None
Improvements
9,536.88
Less depreciation
7,987.23
1,549.65
79,983.26
Profit on sale
$185,016.74
Petitioner elected to report the gain realized from the sale of its assets under section 44(b) of the 1939 Internal Revenue Code, reporting as income in each year subsequent to 1934 the portion of the installment payment representing profit. In an audit of petitioner's Federal income tax returns for the years 1934, 1935, 1936 and 1937 the Internal *107 Revenue Service (then the Bureau of Internal Revenue), denied petitioner the right to include the Keith franchise, the building plans and the land option as cost in computing the gain on the sale of the assets, placed a zero basis on the Keith franchise, the contract for the sale of property, and the plans and specifications, and the petitioner paid the deficiencies resulting from the disallowances of a basis for these assets. Since 1934 the petitioner did not exercise its corporate function of operating a theatre but, instead, held the purchase money mortgage for the purpose of collecting the payments of principal and interest. On March 31, 1952, the petitioner sold the purchase money mortgage, which had been reduced from $230,000 to $136,900, to the Barkhale Co., Inc. for $109,520, at a discount of $27,380. The petitioner was dissolved on December 31, 1952. In its Federal income tax return for 1952 the petitioner reported a gain of $8,124.53 from the sale of the purchase money mortgage. Respondent determined that the petitioner realized a gain of $69,073.85 in 1952 from the sale of this asset. The values in 1913 of the Keith franchise, the contract to purchase the property *108 in Brooklyn, New York, and the plans and specifications were $25,000, $42,000, and $8,000, respectively. Henry Schoenherr, a member of the New York bar since 1897, acted as counsel in the incorporation of the petitioner in 1913. He became a director and secretary-treasurer of the petitioner immediately after the incorporation, and in 1952 he was secretary and director of the petitioner, which positions he had again taken a few years prior to 1952. When he subscribed to the preferred stock of the petitioner he received 65 shares of petitioner's common stock as a "bonus", and he retained his common stock holdings until the petitioner was dissolved in 1952. Schoenherr managed tenement properties on the lower East Side of New York for some years, and he handled real estate matters from 1898 to 1905 for a law firm in which he was managing attorney. He then became associated with one Frank Mann, who was the tenement house commissioner. In 1912 Schoenherr became counsel for a housing project developer in Astoria, New York. Among his other legal work in the real estate field Schoenherr has drawn contracts with architects. Although Schoenherr had clients that were engaged in construction *109 and building activities he never did any building or construction work. He was at one time a member of a syndicate owning several properties in Kings and Queens Counties, New York, and he has owned a tenement house in Brooklyn, New York. He also owned at one time a large apartment house in Freeport, Long Island, and a 60-family apartment house in Flushing, New York. At the time of the hearing Schoenherr had disposed of his real estate holdings except for an interest in some property near New York City. Opinion MULRONEY, Judge: Petitioner was organized in August, 1913, to build and operate a theatre in Brooklyn, New York, and in September, 1913, it issued 750 shares of common stock with a par value of $100 to Newburger and Rasmussen, the promoters active in the organization of the petitioner, in consideration of petitioner's acquisition from them of (1) an agreement to buy for $30,000 the site where the new theatre was to be erected, (2) plans and specifications for the theatre approved by the City of New York, and (3) the Keith franchise. In 1934 petitioner sold the theatre and its other assets with the exception of the Keith franchise, for $265,000, receiving $35,000 in cash and *110 the balance, $230,000, in the form of a purchase money mortgage. Petitioner elected to report the gain from this sale on the installment basis, which permits a vendor to return as income on each taxable year that proportion of the installment payments actually received in that year which the total profit realized in the sale bears to the total contract price. Regulations 111, Sec. 29.44-3. Petitioner reported the gain on the sale in 1952 of the purchase money mortgage under section 44(d) of the 1939 Internal Revenue Code, which deals with gain or loss upon the disposition of installment obligations. [1] Under this section gain or loss is measured by the difference between the basis of the obligation and the amount realized, and the basis of the obligation is defined as "the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full." See Blanche A. Lockhart, 1 T.C. 804. *111 This controversy turns upon the valuation to be given to the assets acquired by the petitioner in 1913 in exchange for its stock, other than the Keith franchise which was not involved in the 1934 sale. Respondent, in computing the gain realized by the petitioner in 1934, assigned a zero basis to these assets. Respondent then determined that petitioner's gain in 1934 was $185,016.74, i.e., $265,000 minus $79,983.26. [2] Using this as the amount of gain realized in 1934, respondent computed the portion out of each annual installment payment received by petitioner returnable as income to be 185,016.74/265,000, or 69.817 per cent. Respondent then argues that if the obligation were satisfied in full in 1952, the amount of returnable income in that year would be 69.817 per cent of $136,900 (face value of the obligation in 1952), or $95,579.47. Under section 44(d), the "basis of the obligation" would be the excess of the face value of the obligation, $136,900, over the amount of income returnable if the obligation were paid in full, $95,579.47, or $41,320.53. Respondent then computes the gain realized by the petitioner in 1952 on the sale of the installment obligation as the excess of the *112 amount realized, $109,520, over the basis of the obligation, $41,320.53, resulting in a gain of $68,199.47. [3]
Petitioner valued the three assets at $75,000, or, in other words, worth the 750 shares of par value stock which was given in exchange for all three, and ascribed a value of $2,500 to the Keith franchise, leaving the amount of $72,500 to be added to the basis of the theatre to be used in computing the gain in the 1934 sale. Using the increased basis, petitioner's gain from the sale of the theatre in 1934 would be $112,516.74 ($265,000 less the total of $79,983.26 and $72,500), and 42.46 per cent (112,516.74/265,000) of each installment payment over the years subsequent to 1934 would be the profit to be reported in income. Under section 44(d) petitioner's returnable income if the obligation were satisfied in full in 1952 would then be 42.46 per cent of $136,900, *113 or $58,127.74, and its "basis of the obligation" (the excess of the face value of the obligation, $136,900, over the returnable amount, $58,127.74) would be $78,772.26. With this latter figure as the basis of the obligation, the petitioner's gain realized from the sale of the obligation in 1952 would be $30,747.74. [4]
When property is acquired by a corporation for its stock the "cost" of such property for the purpose of section 113 of the 1939 Internal Revenue Code is the fair market value of the stock if it can be said there is an established market value for such stock. Where the stock has no established market value, such as may be the case of an original issue, the rule is well settled that the fair market value of such stock, on the date it is exchanged for property "may properly be determined to be the equivalent of the fair market value of the property received." Ida I. McKinney, 32 B.T.A. 450, 456, affd. (C.C.A. 10, 1937) 87 Fed. (2d) 811. Here 750 shares of $100 par value each were exchanged *114 for three assets: (1) the contract to buy the land, (2) the plans and specifications for the theatre to be erected on the land, and (3) the theatrical booking franchise called the Keith franchise for booking vaudeville acts in the theatre building to be erected. The only witness in the case was petitioner's witness, Henry Schoenherr, a lawyer who had prepared and filed the certificate of incorporation and who had had conferences with the promoters, Newburger and Rasmussen. He became a stockholder and director of the corporation a few days after the stock was transferred for the property, and he was a director and stockholder in 1952 (holding 65 shares of stock) when the corporation was dissolved. He described himself as "the only survivor." He said he was consulted by the promoters of this corporation who said they had this land contract, the plans and specifications for the theatre building, and the Keith franchise. He described the land contract as an option for a site with a 165-foot frontage about 100 feet from Flatbush and Church Avenues. This site was described by the witness as "in the heart of Flatbush" and "only site available" and "the best site in Flatbush" for a theatre *115 and he pointed to the good transportation facilities over Flatbush and Church Avenues. In describing the plans and specifications the witness stated they were for a 1,400-seat theatre and the City of New York required an alley on the sides of a theatre, where there is no street frontage, of one foot for every 100 seats in the theatre before the plans would be approved. The plans and the plottage of the building on the site did not allow for a 14-foot alley on the three sides that did not front on the street but they did call for a tunnel under the stage and a steel curtain. Rasmussen, the theatrical architect who was one of the promoters, had prepared the plans and specifications and he had secured their approval and had persuaded the City of New York to issue a permit to build the theatre and it was granted for the building of the theatre on this particular site in accordance with the plans. Thus, the approved plans allowed for a theatre with greater seating capacity than would have been permitted if side alleys had been required. The witness said that in 1913 the Keith franchise was something petitioner had to have if it was going to engage in the theatre business. He said: "At *116 that time, big time vaudeville was controlled by the Keith interests and they did that through the United Booking Offices." He stressed the fact that "you couldn't get an act in your theatre unless you had a franchise." He said he explained this to the directors when he organized the corporation and to prospective purchasers of preferred stock. He said also the Keith franchise was for a theatre on this particular site but he seems to qualify this by saying it was a franchise for a theatre in the Flatbush area, "not down in opposition to the Orpheum or anywhere else." Petitioner had the burden of proof and we do not have too much trouble in agreeing with counsel for petitioner as to the aggregate value of $75,000 to be given to the three assets. Here was a corporation organized in 1913 for the purpose of entering the theatre business, and in order to enter that business, it had to acquire a theatre, or a theatre site on which a theatre building could be erected, municipally approved plans permitting the building of the theatre, and the Keith franchise. These were the required foundation assets and it could obtain these assets in exchange for its stock. It gave all of its common stock *117 with a $75,000 par value for these three assets. We will look at all of the evidence and all of the facts and circumstances, including the contemporaneous acts of interested persons, to see if the corporation received property equivalent to the par value of the stock. We start with the fact that the directors of the corporation valued these three assets as being worth the 750 shares of its par value stock. By appropriate resolutions authorizing and directing the exchange of the stock for the three assets, the directors "adjudged and declared" the three assets "of the fair market value of $75,000.00 and * * * necessary for the business of this company." Without question it was the duty of the directors on an exchange of stock for property to secure property of a value equal to the par value of the stock. In fact many cases (not involving Federal tax) could be cited holding there is a presumption that the judgment of the directors as to the value of the property received for stock is correct, and in the absence of a showing of fraud the directors' valuation governs. Section 69 (formerly section 55) of the Stock Corporation Law of New York authorized the issuance of stock to the amount *118 of the value of property to be used in payment for the property and it further provided "in the absence of fraud in the transaction the judgment of the directors as to the value of the property purchased shall be conclusive." McKinney's Consolidated Laws of New York, Annotated, Book 58. However, we need not decide whether there is such a presumption in a case involving the Federal taxing power, cf. Barnes Coal Mining Co., 3 B.T.A. 891, or whether the directors' valuation must be accepted as conclusively establishing the value of the property in the absence of a showing of fraud. It is enough to say the directors' valuation is some evidence of the value of the three assets, and we can observe their valuation was probably not influenced by tax implications, for the first Federal income tax law was not enacted until October 3, 1913, about a month after the exchange of petitioner's stock for the three assets. The record shows that all who had a part in launching this theatre enterprise in the early days, in effect sanctioned the valuation placed upon the assets by the directors. Advancements of money were made to the corporation, $62,500 worth of preferred stock was sold, *119 and mortgages in the total sum of $79,000 were made to obtain funds to build the theatre and obtain working capital. The purchasers of petitioner's preferred stock and those who loaned money to the petitioner knew its only assets were the three acquired by it for the exchange of stock. Their actions amounted to acquiescence in the directors' appraisal and is some evidence it was correct. Finally we have the testimony of Henry Schoenherr who, if not actually one of the promoters of the corporation, was in fact a prime mover in its creation. He did the primary organizational work for the promoters and it fairly appears he recognized the real worth of the three assets they held. He loaned the corporation $9,000 after it acquired these assets, before he had a share of stock. A little later this and other advancements were paid back to him in the form of preferred stock (totaling $14,000 or $15,000) and, in consideration the promoters who held all of the common stock gave him 65 shares of common. All of the preferred stock was retired by 1940 with all dividends fully paid. He testified he had had wide experience in real estate matters in the general vicinity of New York. He had managed *120 tenement properties, drawn contracts with architects, represented builders, and owned tenement houses in Brooklyn and New York, and an apartment house in Flushing, New York. He gave it as his opinion that the three assets were worth $75,000. It is true Schoenherr was an interested witness as respondent points out, but we do not think his evidence can be disregarded. The quest is for the value of these three assets 43 years ago. Schoenherr's present valuation is buttressed by the fact that he must have entertained the same opinion as to the value of these assets back in 1913 and early 1914 when he was making unsecured loans to the corporation. One more circumstance can be mentioned. This corporation prospered greatly. The wisdom of the directors in acquiring these three initial assets was proven by the financial success that followed. This later success upon a large scale, which was built upon these three assets, is something that cannot be ignored. It can hardly be said the three assets were worthless. Upon the whole record and all of the evidence and facts and circumstances, we are of the opinion that petitioner is right in his contention that in 1913 petitioner exchanged $75,000 *121 worth of stock for $75,000 worth of property. But that does not answer the ultimate issue in the case. The Keith franchise was not involved in the 1934 sale of this corporation's assets. Perhaps by then it was of no value to petitioner. At any rate it was stipulated the Keith franchise was used by the petitioner from September 1914 when the theatre opened for business until June 1916, or a period of less than 2 years. After that the theatre was rented and there is no evidence the franchise was used by the lessees or that they would have had a right to use it and the record indicates the purchaser in 1934 was a competitor of the Keith interests. We do not know the terms of the original Keith contract save that it gave the exclusive right for Keith bookings at this theatre. The contract could not be found. There was no record of its being cancelled. Schoenherr described it as "just a franchise to go to the booking office and get Keith acts." Some value has to be ascribed to this Keith franchise which was not transferred in the 1934 sale, so that it can be deducted from the $75,000 value which we hold would be the basic cost of all three assets. Henry Schoenherr allocated the $75,000 *122 as follows: $2,500 for the Keith franchise, $8,000 for the plans and specifications, and $64,500 for the land contract. This is the allocation upon which petitioner's computation is based. We feel it is too high as to the land contract and too low as to the Keith franchise. All of the three assets were interdependent and their acquisition was a package deal. It is difficult to place a value on any one asset in 1913 when its value would depend largely on ownership of the other two. But the witness emphasized the importance of the Keith franchise to a company about to enter the vaudeville theatre business. He said that in those days the Keith interests controlled big time vaudeville and you couldn't get an act unless you had this franchise. He likened it to an automobile franchise today, saying: "It is the same as you can't sell a Ford car unless you have a Ford franchise." We think it might be a little more like a radio or television station where a major asset might be its broadcasting company franchise, or a newspaper where a major asset might be its press company franchise. At any rate it appeared vital and the witness stated this was the asset he used, presumably as a sales argument, *123 when he talked to persons about buying the preferred stock. It might have been possible to engage in the business without the other two assets. The witness's statement that the site covered by the land contract was the only available one in the Flatbush area, must be interpreted as his opinion that it was the best available site obtainable for a theatre in that area. We are not convinced petitioner could not have secured some other site in the area and possibly with other plans conforming to municipal regulations entered the theatrical business with Keith acts. This is not to say the combination of all three was not worth the $75,000. We merely take petitioner's evidence at full value when we say that in 1913 the Keith contract was highly important. Petitioner's own evidence makes it abundantly clear that without the Keith franchise the business never would have been started. It matters not that the Keith contract soon went down in value, until, by 1934, it was of little or no value. It is the value in September 1913 that is important. To find that value we have to go back to the heyday of vaudeville which the petitioner's own witness said was controlled by the Keith interests. *124 We will let petitioner's allocation for the plans and specifications stand at $8,000, but we feel the Keith franchise was worth at least $25,000 to the petitioner in September 1913. This will reduce petitioner's allocation for the contract to $42,000. The plans and specifications, which we will value at $8,000 in 1913, were obviously a part of the cost of the building and therefore subject to depreciation from the year 1914 when the building was completed to the year 1934 when it was sold. It has been stipulated the cost of the building, without considering the plans, was $124,998.90 and that the depreciation by 1934 was $76,620.68. This depreciation rate seems to have been about 3 per cent a year. We think the cost of the plans should depreciate at the same rate and such depreciated cost, added to the $42,000 allocated to the land contract, should be allowed as an addition to the basis of the theatre building in computing the gain from the sale of such building in 1934. Decision will be entered under Rule 50. Footnotes
1. Sec. 44. INSTALLMENT BASIS. * * *
(d) Gain or Loss Upon Disposition of Installment Obligations. - If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange - the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange - the fair market value of the obligation at the time of such distribution, transmission, or disposition. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.↩
2. The parties have stipulated this figure as the basis of the theatre in 1934 without considering the basis to be attributed to the plans and specifications, the land contract, and the Keith franchise. ↩
3. Respondent concedes that the gain shown on the statutory notice to the petitioner as $69,073.85 is erroneous.↩
4. Petitioner reported a gain of $8,124.53 from this sale on its Federal income tax return for 1952. It does not appear how this amount was computed.↩